WILLIAM STEERE, appellant, v. HARRY GREEN, T. S. ALBRECHT and THE GREEN LIMESTONE COMPANY, a copartnership, appellees.

No. 48986.

(Reported in 77 N.W.2d 924)

JULY 26, 1956.

Uhlenhopp & Cady, of Hampton, for appellant.

Zastrow, Noah & Smith, of Charles City, for appellees.

THOMPSON, C. J.—On May 6, 1950, the plaintiff, the owner of a farm in Butler County, leased to defendants, a copartnership, for a term of five years, a tract of land to be used as a limestone and rock quarry. The contract was in writing, except that the land leased was described as "a certain agreed acreage." The part of the contract defining the tract was therefore oral. The contract further provided "for the purpose of quarrying, crushing, screening, processing, storing, offering for sale and selling agricultural lime, crushed stone, or any other product on the tract to be marked and designated on the real estate which is described as follows: On the farm located in the Northeast Quarter of Sec. 25, Coldwater Township, Butler County." Said lease also provides for a roadway from the highway to the scene of the operations, and contains the following clause: "First party will build and maintain any necessary fences to fence out their livestock from the quarry and right of way", and contains a further provision: "Second parties agree not to extend excavation so as to destroy the support of said fences." The exact tract leased is now in dispute, and the controversy concerning it furnishes the basis for the allegations of Count I of plaintiff's petition. It is charged that the defendants have

extended their operations considerably beyond the ground actually leased to them, and plaintiff asks damages for injury to his real estate and an injunction restraining further trespass. Count II in effect asks a reformation of the contract by eliminating therefrom this clause: "Second parties (the defendants) shall have the option to renew this agreement for the period of five years upon the expiration of this agreement." The trial court found both issues with the defendants and dismissed both counts of the petition.

I. The issues here are factual. Such legal questions as are involved are well settled, and there is no real dispute between the parties concerning them. On May 6, 1950, the plaintiff was owner of a 160-acre farm on which there was an outcropping of limestone. A fence ran east and west along the north edge of this outcropping, leaving a strip of ground about ten rods wide between it and the south boundary line of the farm. On this date the plaintiff met the defendant Green and one Martin Senne, a nephew of plaintiff who was an employee of defendants, at or near the scene of the limestone deposit, and made a tentative agreement for the lease. The lease was prepared by defendants and taken by Senne to plaintiff's farm later on the same day, where plaintiff executed it. Further evidence in regard to what transpired at the time of the signing will be related in our discussion of the issues under Count II of the petition.

The defendants entered upon the land and very shortly thereafter removed the fence above referred to, which we shall refer to as X fence. That they have taken a considerable quantity of limestone from the field lying north of X fence is not disputed. The plaintiff claims this was not covered by the oral agreement, but that he leased to defendants only that part of the ground lying south of X fence. This defendants dispute. They say the oral agreement covered the ground lying north of the fence also, and extending north to another fence dividing this land, which seems to have been an alfalfa field, from other agricultural land lying north of it. The dispute at this point may be summed up by stating plaintiff asserts the leased ground was all south of X fence, a strip about ten rods north and south by 746 feet east and west; while defendants say the agreement covered

a tract 469 feet north and south with same boundaries east and west, thus including the alfalfa field lying north of X fence. There is no apparent dispute as to the east-and-west dimensions, nor that defendants have paid all royalties for limestone quarried.

It will be noted that the written contract required the plaintiff to "build and maintain any necessary fences to fence out their livestock from the quarry and right of way." The fences on the east, west, north and south have all been maintained by the plaintiff. A short distance south of the fence on the north side of the alfalfa field—the tract upon which plaintiff claims the defendants have trespassed—the plaintiff built a parallel fence, thus making a lane by which his cattle could reach a pasture lying to the west.

The plaintiff testified that the agreed tract was that lying south of X fence then extending from east to west across the exposed limestone deposit, and that when the defendants first began to strip and quarry north of this point he and his family protested, and later started this action; and that it was about two years after the quarrying started before the defendants removed this fence and began operations north of it, in what is known in the record as the alfalfa field. The defendant Green says the agreed tract covered also the land north of X fence including the alfalfa field, a total distance north and south of about 469 feet. He says that there was not enough room or enough rock south of X fence to make it feasible to open a quarry, and he would not have been interested in a lease of that part only.

 The trial court, recognizing the impossibility of reconciling all the testimony, concluded that plaintiff had failed to establish his case by the required quantum of proof. Where the credibility of witnesses is concerned we give weight to the fact findings of the trial court. Blum v. Keene, 245 Iowa 867, 899, 63 N.W.2d 197, 214, and cases cited. We think, also, that the weight of the evidence is that the controversial X fence, which plaintiff claims was the north line of the tract leased, was removed early in defendants' operations there; and that they had quarried for a considerable time north of the line before any protest was made. Another significant fact appears in plaintiff's testimony,

at the point when he tells of his employment of counsel to protest the invasion of his alfalfa field. He says that he employed Carroll Wild, then a practicing attorney in Allison, and "we went and talked to Tommy Albrecht" (one of the defendant partners). Mr. Wild talked to Albrecht, and this testimony of the plaintiff then appears: "Q. What was said at that talk? A. Well, Carroll Wild told him they didn't have a right to haul that dirt out of there." It appears from this that the plaintiff's complaint at first was not addressed to the matter of quarrying north of what he now claims was the proper line, but to the removal of the stripped dirt from the premises. There is adequate basis for the trial court's factual determination that the interpretation of the contract by the plaintiff for a considerable period supports the defendants' version, and we reach the same conclusion.

II. In Count II the plaintiff asks that the clause giving defendants an option to renew for an additional five-year period be stricken from the contract. This is in substance a plea for reformation. The plaintiff testified that the question of optional renewal was never discussed prior to the time the written contract was presented to him for his signature; that he is unable to read or write, and that when his nephew, Martin Senne, the defendants' employee, brought the contract to him, Senne read only part of it. He asked Senne what the lease said about time, and Senne told him it would end in May of 1955, five years from its date. The plaintiff is corroborated in this testimony by his son, Eugene Roger Steere, who says he was present when Senne brought the lease.

Senne, as a witness for the defendants, says he was present when the preliminary discussion which led up to the lease was held, and did not hear anything said about an option to renew; but that it was in the written lease which he took to plaintiff's farm later in the day; that he read the entire lease to plaintiff before he signed it, and plaintiff made no objection. The defendant Green testified that he told the plaintiff he would want an option for renewal when they first discussed the lease, and plaintiff made no objection.

A written contract may be reformed only when there is evidence of fraud, duress or mutual mistake. Roder v. De Vries, 246 Iowa 841, 844, 69 N.W.2d 425, 427. Assuming that plaintiff's

evidence makes some showing of fraud, we reach the rule that reformation of a written contract can be decreed only if the evidence is clear, satisfactory and convincing. Roder v. De Vries, supra; Haugh v. Lanz, 187 Iowa 841, 845, 172 N.W. 199, 200. We turn then to the task of measuring by this yardstick the showing made in the record.

 In addition to the testimony of witnesses referred to above, there is a quite significant matter appearing in the pleadings. Plaintiff filed his first petition in this cause on October 23, 1953, attaching thereto a copy of the written lease, Exhibit A, containing of course the option agreement; and on October 14, 1954, he filed an amendment to this petition. In neither the original petition nor the amendment was there any reference to or complaint concerning the option clause. The first petition and amendment were apparently filed by different counsel from those who filed the later recast petition and who tried the case and who prosecute this appeal. It was not until April 20, 1955, when plaintiff filed his "Amended and Recast Petition" that it was first charged that he had no knowledge of and had never agreed to the option for renewal. This appeared in Count II of the recast petition. His failure to raise the question for a year and one half after he had first commenced his litigation militates heavily against him. Since he attached a copy of the lease to his first petition filed October 23, 1953, he must have known of its contents then; and if he felt aggrieved by the insertion of a material matter of which he had not been informed and to which he had not agreed, it is difficult to understand why complaint was not made. We conclude he has not shown grounds for reformation by a sufficient quantum of evidence to meet the clear, satisfactory and convincing test required by the rule above set forth. —Affirmed.

All JUSTICES concur.